No. 2023-2165

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

GUIZHOU TYRE CO., LTD.,
GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,
*Plaintiffs-Appellants*,

CHINA MANUFACTURERS ALLIANCE LLC, SHANGHAI HUAYI
GROUP CORPORATION LIMITED, fka Double Coin Holdings, Ltd.,
*Plaintiffs*,

v.

UNITED STATES,
*Defendant-Appellee*.

Appeal from the United States Court of International Trade
in Case No. 1:19-CV-00031, Senior Judge Timothy C. Stanceu

**NON-CONFIDENTIAL RESPONSE BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES**

<div style="margin-left:45%">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

KARA M. WESTERCAMP

</div>

Of Counsel:

ELIO GONZALEZ

Senior Counsel
U.S. Department of Commerce
Office of the Chief Counsel for
   Trade Enforcement and Compliance

Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7571
Fax: (202) 514-8640
Email: kara.m.westercamp@usdoj.gov

February 29, 2024

*Attorneys for the United States*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .................................................................. vii

STATEMENT OF THE ISSUE .......................................................................... 1

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS ............. 1

    I.    Nature Of The Case ........................................................................... 1

    II.    Statement Of Facts And Course Of Proceedings Below ...................... 2

        A.    Antidumping Duty Proceedings In Non-Market Economy
            Countries ................................................................................ 2

        B.    Commerce's Antidumping Duty Investigation ......................... 5

        C.    The Trial Court's Remand Order .............................................. 5

        D.    Commerce's Remand Redetermination ..................................... 7

        E.    The Trial Court Sustained Commerce's Determination That
            GTCIE Was Not Eligible For A Separate Rate ....................... 10

ARGUMENT .................................................................................................. 12

    I.    Standard Of Review ......................................................................... 12

    II.    The Trial Court Correctly Sustained Commerce's Determination That
        Guizhou Tyre Failed To Rebut The Presumption Of Government
        Control ............................................................................................ 13

    III.    Guizhou Tyre's Arguments Are Unavailing And Guizhou Tyre
        Cannot Rebut The Presumption Of Government Control ................. 21

        A.    The Burden To Rebut Government Control Is On The
            Respondent ............................................................................ 22

B.    Substantial Evidence Supports Commerce's Determination That, Despite Minority Ownership, GTCIE Failed To Rebut The Presumption Of Government Control .............................. 24

CONCLUSION ...................................................................................... 36

**CONFIDENTIAL MATERIAL DELETED**

The confidential material deleted on pages 9, 10, 16, 19, 32, and 33, consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
   802 F.3d 1339 (Fed. Cir. 2015) ........................................................ 13

*Adv. Tech. & Materials Co., Ltd. v. United States*,
   938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) .................................... 25

*AMS Assocs. v. United States*,
   719 F.3d 1367 (Fed. Cir. 2013) .......................................................... 3

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
   284 F. Supp. 3d 1350 (Ct. Int'l Trade 2018) .............................. 4, 14, 26, 29, 30

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ........................................................ 13

*Aukerman Co. v. R. L. Chaides Construction Co.*,
   960 F.2d 1020 (Fed. Cir. 1992) ........................................................ 23

*Can Tho Imp.-Exp. Joint Stock Co. v. United States*,
   435 F. Supp. 3d 1300–06 (Ct. Int'l Trade 2020) ............................... 4

*Changzhou Hawd Flooring Co. v. United States*,
   848 F.3d 1006 (Fed. Cir. 2017) ..................................................... 4, 5

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
   701 F.3d 1367 (Fed. Cir. 2012) .......................................................... 5

*China Mfrs. Alliance, LLC v. United States*,
   1 F.4th 1028 (Fed. Cir. 2021) ......................................................... 3, 4

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) .................................................................... 12, 13

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ........................................................................ 13

*Diamond Sawblades Mfrs. Coal. v. United States*,
866 F.3d 1304 (Fed. Cir. 2017) ...................................................... 2, 4, 22, 30, 31

*Dongtai Peak Honey Indus. Co. v. United States*
777 F.3d 1343 (Fed. Cir 2015) ...................................................... 22, 31

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ........................................................ 23, 33, 34

*Guizhou Tyre Co. v. United States*,
641 F. Supp. 3d 1386 (Ct. Int'l Trade 2023) ............................................. passim

*Guizhou Tyre Co., Ltd v. United States*,
557 F. Supp. 3d 1302 (Ct. Int'l Trade 2022) ............................................. passim

*I.D.I. Int'l Dev. and Inv. Corp. v. United States*,
Ct. No. 20-00107, 2021 WL 3082807 (Ct. Int'l Trade July 6, 2021) .............. 14

*Inland Steel Indus., Inc. v. United States*,
188 F.3d 1349 (Fed. Cir. 1999) ...................................................... 34

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*,
121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015) .............................................. 25, 26

*Jilin Forest Industry Jinqiao Flooring Group Co. v. United States*,
617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) .................................................24

*Michaels Stores, Inc. v. United States*,
766 F.3d 1388 (Fed. Cir. 2014) ........................................................5

*New Mexico Garlic Growers Coal. v. United States*,
352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ...................................... 34

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .................................................. 13, 23

*Nippon Steel v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ...................................................... 12

*Rogero v. Sec'y of Health and Human Servs.*,
    748 F. App'x 996 (Fed. Cir. 2018) ...............................................31, 32

*Sigma Corp. v. United States*,
    117 F. 3d 1401 (Fed. Cir. 1997) ...............................................passim

*SKF USA Inc v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ....................................... 34

*Transcom, Inc. v. United States*,
    294 F.3d 1371 (Fed. Cir. 2002) .........................................2

*Union Steel v. United States*,
    713 F.3d 1101 (Fed. Cir. 2013)(i) ................................... 12

*Yantai CMC Bearing Co. v. United States*,
    203 F. Supp. 3d 1317–26 (Ct. Int'l Trade 2017) .............................. 4, 13, 14, 28

*Zhejiang Mach. Imp. v. United States*,
    65 F.4th 1364 (Fed. Cir. 2023) ...............................................3, 22, 31

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
    350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ............................. 4, 14, 20, 21, 22

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i). ..............................................................12

## ADMINISTRATIVE DECISIONS

*Truck and Bus Tires from China*,
    82 Fed. Reg. 8,599 (Dep't of Commerce Jan. 27, 2017) .....................................1

*Truck and Bus Tires from China*,
    84 Fed. Reg. 4,436 (Dep't of Commerce Feb. 15, 2019).....................................1

*Silicon Carbide from the People's Republic of China,*,
    59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) .....................................2

*53-Foot Domestic Dry Containers from China,*
    80 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) ..........................14, 26

*Off-the-Road Tires from China,*
    80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015) .................................34

*Off-the-Road Tires from the People's Republic of China,*
    82 Fed. Reg. 13,733 (Dep't of Commerce Apr. 21, 2017) .................................35

*Truck and Bus Tires from China,*
    84 Fed. Reg. 4,436 (Dep't of Commerce Feb. 15, 2019).....................................1

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title. The Court has designated the following cases as companion cases: *Guizhou Tyre Co., Ltd. v. United States*, Court No. 23-2163, *Guizhou Tyre Co., Ltd. v. United States*, Court No. 23-2164, and *China Manufacturers Alliance v. United States*, Court No. 23-2391.

## STATEMENT OF THE ISSUE

Whether the Department of Commerce's determination that Guizhou Tyre Import & Export Co., Ltd. failed to rebut the presumption of *de facto* government control is supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

## I.    Nature Of The Case

This appeal concerns the Department of Commerce's (Commerce) final determination in the antidumping duty investigation covering truck and bus tires from the People's Republic of China, and the resulting antidumping duty order. *See Truck and Bus Tires from China*, 82 Fed. Reg. 8,599 (Dep't of Commerce Jan. 27, 2017) (final determ.), Appx104-109, and accompanying Issues and Decision Memorandum (IDM), Appx37-103; *Truck and Bus Tires from the People's Republic of China*, 84 Fed. Reg. 4,436 (Dep't of Commerce Feb. 15, 2019) (amended final deter. and countervailing duty order), Appx110-116.  Plaintiff-appellants Guizhou Tyre Co., Ltd. (GTC) and Guizhou Tyre Import & Export Co., Ltd (GTCIE) (collectively, Guizhou Tyre) appealed the final judgment of the United States Court of International Trade entered following the issuance of *Guizhou Tyre Co. v. United States*, 641 F. Supp. 3d 1386 (Ct. Int'l Trade 2023) (*Guizhou Tyre II*), Appx25-36.

1

## II.   Statement Of Facts And Course Of Proceedings Below

### A.   Antidumping Duty Proceedings In Non-Market Economy Countries

Commerce considers China to be a non-market economy country; therefore, the administrative proceeding at issue is a non-market economy antidumping proceeding. *Sigma Corp. v. United States*, 117 F. 3d 1401, 1405-06 (Fed. Cir. 1997). In non-market economy antidumping proceedings, Commerce maintains a rebuttable presumption that all companies within that country are subject to government control and, thus, should be assessed a single weighted-average dumping margin. *Id.* Thus, Commerce assigns all exporters of the merchandise subject to review in non-market economy countries a single rate unless the exporter can affirmatively demonstrate an absence of both *de jure* and *de facto* government control with respect to imports. *Id.* If exporters can provide sufficient evidence demonstrating absence of government control, Commerce will calculate a separate rate, different from the mandatory respondents. *See, e.g.*, *id.* at 1405; *Transcom, Inc. v. United States*, 294 F.3d 1371, 1373 (Fed. Cir. 2002). The burden of proving the absence of government control lies with the exporter. *Sigma Corp.*, 117 F. 3d at 1405-06; *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1311 (Fed. Cir. 2017). Exporters that are unable to demonstrate both *de facto* and *de jure* independence from government control do not qualify for a

2

separate rate. *See China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1032 (Fed. Cir. 2021).

Commerce considers three factors when determining whether an exporter enjoys independence from *de jure* government control: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies. *See Sigma Corp.*, 117 F. 3d at 1405; *AMS Assocs. v. United States*, 719 F.3d 1367, 1379 (Fed. Cir. 2013).

Commerce considers four factors in determining whether an exporter is free from *de facto* government control: (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See Zhejiang Mach. Imp. v. United States*, 65 F.4th 1364, 1366 (Fed. Cir. 2023); Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries at 2 (Apr. 5, 2005) (Policy Bulletin 05.1); *Silicon Carbide from the People's Republic of*

3

*China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) (final less-than-fair-value determ.).  All four factors of the *de facto* test must be satisfied to rebut the presumption of government control.  *See Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1325–26 (Ct. Int'l Trade 2017); *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1321 (Ct. Int'l Trade 2018).

The percentage of government ownership of a responding company is highly relevant to Commerce's *de facto* analysis because majority ownership is considered to be actual control, regardless of whether such control is actually exercised.  *See Can Tho Imp.-Exp. Joint Stock Co. v. United States*, 435 F. Supp. 3d 1300, 1305–06 (Ct. Int'l Trade 2020); *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2018).  When a government has a minority ownership interest in a respondent company, "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control. . . ."  *An Giang Fisheries*, 284 F. Supp. 3d at 1359.

This Court has repeatedly sustained Commerce's use of the rebuttable presumption of government control in non-market economies.  *See, e.g.*, *China Mfrs. Alliance*, 1 F.4th at 1037; *Sigma Corp.*, 117 F.3d 1401; *Diamond Sawblades*, 866 F.3d at 1311; *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006,

4

1009 (Fed. Cir. 2017); *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1390 (Fed. Cir. 2014); *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1370 (Fed. Cir. 2012).

### B.    Commerce's Antidumping Duty Investigation

On September 6, 2016, Commerce published its preliminary determination in the antidumping duty investigation covering truck and bus tires from China and preliminary determined that GTCIE was not eligible for a separate rate because it failed to rebut the presumption of *de facto* government control.  Appx1408, Appx1436.  On January 27, 2017, Commerce published its final determination, in which it continued to determine that GTCIE was not eligible for a separate rate because it failed to rebut the presumption of *de facto* government control. Appx52-64.  Thus, Commerce continued to treat GTCIE as part of the China-wide entity and assigned it the China-wide rate of 22.57 percent.  Appx115.  Litigation followed.

### C.    The Trial Court's Remand Order

On January 24, 2022, the trial court remanded certain aspects of the final determination, including Commerce's determination that GTCIE failed to rebut the presumption of government control.  *Guizhou Tyre Co., Ltd v. United States*, 557

F. Supp. 3d 1302 (Ct. Int'l Trade 2022) (*Guizhou Tyre I*), Appx3-23.[1]  The trial

court held that Commerce made incorrect factual findings regarding whether

certain shareholder meetings were open to all shareholders, that Commerce's

reasoning was flawed as to whether its inquiry focused on government control of

export activities, and that Commerce failed to explain or clarify whether its finding

of government control extended to GTCIE's export activities during the period of

investigation.  Appx13-15.

Specifically, the court held that Commerce failed to support its finding that

board meetings were not open to all shareholders.  This finding formed the basis

for Commerce's determination that shareholders of Guiyang Industry Investment

Group Co., Ltd. (GIIG), which is 100 percent owned by the Guiyang State-owned

Assets Supervision and Administration Commission (SASAC), "succeeded in

electing board members at the July 2015 meeting after being unsuccessful in

attempting to do so at the May 2015 meeting."  Appx13-14.  In other words, the

---

[1]  The trial court also held that Commerce prematurely issued the
antidumping duty order.  *See* Appx7-13, Appx29-30.  Upon the trial court's
issuance of its judgment, Commerce amended the antidumping duty order to have
an effective date of February 21, 2020.  *See Truck and Bus Tires from China*, 88
Fed. Reg. 37,023 (Dep't of Commerce June 6, 2023) (amended order); *Truck and
Bus Tires from China*, 88 Fed. Reg. 38,819 (Dep't of Commerce June 14, 2023)
(correction to amended order).  In addition, in *Guizhou Tyre II*, the trial court
sustained Commerce's determination that Shanghai Huayi Group Corporation
Limited (formerly Double Coin Holdings Ltd.) did not rebut the presumption of *de
facto* government control.  *See* Appx33-35.  These issues were not appealed.

court held that Commerce failed to support its "conclusion that GIIC effectively 'appointed' board members at the July 15 meeting." Appx14. Moreover, the court held that Commerce's analysis was deficient "with respect to the findings on board member and management selection, and on profit distribution," which led to a "vague and ambiguous" analysis of whether the Chinese government "exercised control of GTCIE's 'export activities' or 'export functions.'" Appx14-15. Relatedly, the court held that Commerce's "analysis fails to clarify or explain whether its finding of government control extended, specifically, to GTCIE's export activities during the period of investigation." Appx16. Thus, the court held that "{u}nder the 'rebuttable presumption' method" of Commerce's separate rate analysis, on remand, Commerce must "consider the record as a whole and make a factual determination on whether the Chinese government actually controlled Guizhou Tyre's export functions and export pricing decisions during the period of investigation." *Id.*

### D.    **Commerce's Remand Redetermination**

On remand, Commerce complied with the trial court's remand order and reconsidered and further explained its separate rate determination for GTCIE. Appx122-149, Appx155-177. Specifically, Commerce explained that although "details of the May 2015 and July 2015 meetings indicate that public notices were available to all shareholders{, . . . } other record evidence demonstrates that

GTCIE did not operate independent of government control." Appx124.

Commerce provided further explanation of its presumption of state control in non-market economy countries, explaining that it "considers that the four *de facto* criteria and the related questions that appear in the separate rate application constitute Commerce's analysis of 'export functions,' which is a required part of Commerce's *de facto* control analysis." Appx125; *see also* Appx124-126.

Considering the entire record, however, Commerce continued to find GTCIE ineligible for a separate rate because GIIG, a state-owned enterprise, had control over GTC, and ultimately GTCIE, including the selection of management and the profitability of the companies. Appx126-132. For example, while GTC claimed that its Articles of Association in place during the period of investigation "appear on their face to place safeguards against undue influence by large shareholders in the selection of GTC's senior managers, the record demonstrates that those safeguards were unsuccessful in the instant case" because "GIIG was ultimately able to dominate GTC's decision-making process, despite such safeguards, and appoint its preferred members to GTC's board." Appx128.

Regarding the shareholders' meeting in question, Commerce considered that only GIIG individually has the requisite number of shares (three percent) to convene a shareholders meeting, and that it can therefore effectively convene meetings on GIIG's favored proposals until they prevail, which happened at the

BUSINESS PROPRIETARY INFORMATION DELETED

July 2015 meeting.  Appx126-132.  And during the July 2015 shareholder meeting,

record evidence demonstrated that GIIG was still able to pass proposals that

[ #             ].  Appx129.

     Commerce also considered the remaining evidence relating to GIIG's

ownership stake in GTC and GTCIE and its consequent level of control over board

selection and profit distribution, in addition to connections between GTC's board

chairman and GIIG, and concluded that GTCIE continued to be ineligible for a

separate rate.  *Id.*  For example, Commerce explained that the record showed that

GTC's Chairman is also [ #          ] and citing other evidence

of the interconnectedness of the companies, Commerce determined that "GIIG's

role in the board selection process also impacts the profit distribution of the

company."  *Id.*

     As to the degree of government control, that is, majority or minority

ownership, Commerce explained that it remains the "*burden of the respondent* to

rebut the presumption by providing sufficient evidence to establish that it operates

autonomously from the government in certain key aspects (*i.e.*, those enumerated

in the *de facto* criteria)."  Appx134 (emphasis in original).  But with respect to

GTCIE, Commerce explained that "[ #                    

#    ] of whom are [ #       ], and GTC [ #        

#      ], who control the operations of the company, including GTCIE's export

activity." *Id.* Thus, as Commerce noted, "control of the board and appointment of management equates to potential control of the company's operations (which necessarily includes export operations)." Appx134-135.

Relatedly, Commerce also addressed Guizhou Tyre's argument that Commerce's separate rate analysis contradicts its longstanding practice. Appx175-177. Consistent with its practice and relevant caselaw, Commerce examined "whether the government might be able to exercise, or have the potential to exercise, control of a company's operations through a *minority* government ownership under certain factual scenarios." Appx170 (emphasis in original). And here, despite minority ownership, Commerce "concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management." Appx171.

Thus, Commerce concluded that GTCIE was not eligible for a separate rate because Guizhou Tyre failed to "rebut the presumption of government control or potential for control over export functions." Appx139.

### E. The Trial Court Sustained Commerce's Determination That GTCIE Was Not Eligible For A Separate Rate

The trial court sustained Commerce's redetermination in all respects, including the issue appealed here. Appx25-36. First, the trial court rejected

Guizhou Tyre's argument that the remand redetermination did not comply with
*Guizhou I* because "they read too much" into the decision "and they incorrectly
presume that Commerce lacked any discretion to apply its four-part test so as to
require independence from government control as to each of the four factors."
Appx31.  Indeed, "the court's decision did not go so far as to require Commerce to
recognize separate rate status absent evidence of government control of export
prices."  *Id.*  Instead, due to the "breadth" of Commerce's discretion, the court
acknowledged that although Guizhou Tyre "general{ly} object{ed}" to
Commerce's methodology, "Commerce reasonably could find or infer that GIIG
had the power to exert significant control or influence over the business operations
of GTC and its wholly-owned affiliate, GTCIE, including operations involving
exports."  Appx32.

The trial court also found "unconvincing" Guizhou Tyre's arguments that it
rebutted the presumption of government control.  *Id.*  It held that "{t}he evidence
concerning the formalities of the nomination process does not refute evidence,
including evidence on ownership, the {Articles of Association}, and proprietary
information on voting records, that together demonstrate GIIG's ability to control
or influence the general business operations of GTC and GTCIE and, specifically,
profit distribution."  *Id.* (citation omitted).

Finally, the trial court addressed and rejected Guizhou Tyre's arguments that Commerce had departed from "longstanding" practice and instead "myopically fixates on management selection and to a lesser extent profit distribution." *Id.* The court recognized that an agency may change its practice if it provides an adequate explanation, which Commerce did here as its separate rate practice evolved. Appx32-33. In sum, it held that Commerce's methodology is "adequately explained," "reasonable," and that "Commerce acted upon a sufficient basis in the record evidence when it denied separate rate status to GTCIE." Appx33.

This appeal followed.

## ARGUMENT

## I.    Standard Of Review

In reviewing the trial court's judgments, this Court "reappl{ies} the statutory standard of review that the Court of International Trade applied in reviewing the administrative record." *Nippon Steel v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (citation omitted). This Court will uphold Commerce's determination unless it is unsupported by substantial record evidence, or otherwise unlawful. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).  Substantial evidence may also be "less than the weight of

the evidence," and the possibility of drawing inconsistent conclusions from the

record does not render Commerce's findings unsupported by substantial evidence.

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  A party disputing

Commerce's determination as unsupported by substantial evidence thus "has

chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United

States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006), and the Court will sustain

Commerce's determinations if they are reasonable and supported by the record as a

whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United

States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.    The Trial Court Correctly Sustained Commerce's Determination That Guizhou Tyre Failed To Rebut The Presumption Of Government Control

The trial court correctly sustained Commerce's determination that Guizhou

Tyre failed to rebut the presumption of *de facto* government control.  Appx31-33.

As explained above, there are four *de facto* criteria that a company must satisfy to

rebut the presumption of government control.  *See Ad Hoc Shrimp Trade Action

Comm. v. United States*, 802 F.3d 1339, 1090 n.21 (Fed. Cir. 2015).  Companies

must satisfy all four criteria, but Commerce does not necessarily need to analyze

all four factors because it can determine, based on the failure to meet any one

factor, that an entity is under *de facto* government control.  *See Yantai CMC*

*Bearing*, 203 F. Supp. 3d at 1325-26 ("Yantai CMC failed to meet the third factor of the test.  Given that all four factors must be satisfied, Commerce had no further obligation to continue with the analysis."); *I.D.I. Int'l Dev. and Inv. Corp. v. United States*, Ct. No. 20-00107, Slip Op. 21-82, 2021 WL 3082807, at \*6 (Ct. Int'l Trade July 6, 2021) ("Because Plaintiffs failed to satisfy one *de facto* criterion, Commerce had no further obligation to continue with the analysis.").

When a company is majority-owned by a state-controlled entity, majority ownership alone may be sufficient to support a finding of control (absent a rebuttal of the presumption).  *See, e.g.*, *Zhejiang Quzhou*, 350 F. Supp. 3d at 1323.  When a respondent company is minority government-owned, as here, Commerce evaluates evidence related to the four *de facto* factors and considers whether there are additional indicia of control in determining whether the company has successfully rebutted the presumption of government control.  *See An Giang Fisheries*, 284 F. Supp. 3d at 1359.  Commerce's practice, which has evolved following litigation, is "to examine whether the government might be able to, or have the potential to exercise, control of a company's general operations through minority government ownership under certain factual scenarios."  Appx169 (citing *53-Foot Domestic Dry Containers from China*, 80 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) (final less-than-fair-value determ.), and accompanying IDM).  Thus, in a minority government control scenario, Commerce's determination that an exporter

"is *potentially* controlled by the government – in the sense that the government has the '*ability* to exercise control (even without exercising it)' – suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control." *I.D.I.*, 2021 WL 3082807, at *7 (emphasis in original) (quoting *An Giang Fisheries*, 284 F. Supp. 3d at 1359).

Here, Commerce acted in accordance with its stated practice, finding additional indicia of control and the ability of the Chinese government to exercise control through minority ownership. Appx137-138. The record demonstrates that SASAC wholly owns and supervises GIIG, which owns 25.20 percent of GTC and is its largest shareholder. Appx122. In fact, GIIG is the *only* shareholder to own more than one percent of GTC's voting shares. Appx126. GTC correspondingly owns 100 percent of GTCIE. Appx122. Thus, GIIG is a state-owned enterprise, it is GTC's largest shareholder with a 25.20 percent ownership share, and as further discussed below, additional indicia demonstrate that it has the ability to control, and an interest in controlling, the operations at GTC, and ultimately GTCIE, including with respect to its export functions. Appx122, Appx126-127.

Accordingly, the trial court correctly held that substantial evidence supported Commerce's determination that Guizhou Tyre failed to rebut the presumption of control regarding the third factor, *i.e.*, the selection of management, and the trial court correctly held that "Commerce acted upon a sufficient basis in

15

BUSINESS PROPRIETARY INFORMATION DELETED

the record evidence when it denied separate rate status to GTCIE." Appx33.  For

example, Commerce considered that GIIG "is the only shareholder with the

requisite shares to individually put forward proposals for consideration at

shareholders' meetings," and this allows "GIIG to remain in a supervisory position

over GTC despite its less-than-majority ownership." Appx127-128.  While

Guizhou Tyre claims it had safeguards in place through its Articles of Association

during the period of investigation, Commerce explained that "the record

demonstrates that those safeguards were unsuccessful in the instant case" because

"GIIG was ultimately able to dominate GTC's decision-making process, despite

such safeguards, and appoint its preferred members to GTC's board." Appx128.

Indeed, the supposed safeguards were ineffective because [                    ]

predominated the [                         ] and the July 2015 shareholder

meeting in which [        ] passed business items regardless of [

            ].  Appx128-129.

Commerce also considered additional indicia of control and determined that

GTC's nomination and voting processes for directors and management under the

Articles of Association allowed Guiyang SASAC, through GIIG, to influence the

board selection process during the period of investigation.  Appx127.  The trial

court observed that this information supported Commerce's determination that the

16

record "demonstrated GTC's lack of independence from GIIG's ability to control

or influence {GTC}." Appx30.

For example, the trial court considered that Article 83 provides that "non-independent directors are nominated by the board of directors or shareholders

holding individually or jointly more than ten percent of the company's shares, and

that 'independent directors are nominated by the board of directors, board of

supervisors, or shareholders individually or jointly holding more than one percent

of company shares." *Id.* In analyzing the supposed safeguards of the Articles of

Association, Commerce considered it significant, and the trial court recognized,

that "{w}ith its 25.20 percent ownership share, GIIG is the only individual

shareholder with more than ten percent or even one percent of shares." *Id.*

Additionally, "because GIIG is the only shareholder with more than three percent

of shares, GIIG is the *only* shareholder with the requisite shares to *individually* put

forward proposals for consideration at shareholders' meetings," pursuant to Article

54." *Id.* (emphasis added). No other shareholder can individually put forward

proposals at shareholder meetings. *Id.*

Further, the trial court also considered that "Article 117 states that the

chairperson and vice chairperson shall be elected and dismissed by the votes of

more than half of all directors." *Id.* Moreover, under Article 130, Commerce

considered that "the board of directors shall appoint or remove GTC's general

manager and four deputy managers." *Id.* These additional indicia of control

support Commerce's determination that "GIIG is able to exert control through

shareholders' meetings, the selection of directors, and, in turn, the selection of the

chairperson." Appx128. And even though Guizhou Tyre argued that the

December 2012 meeting "complied with all legal requirements" and that there was

no impropriety at the meeting, Commerce "found that GIIG effectively selected

GTC's board." Appx168. To ignore the way in which the board was elected in

2012, as Guizhou Tyre advocates, "would leave Commerce unable to consider

government involvement in selecting a board if that involvement pre-dated the

period of investigation or review at issue, even if the board remains the same

during the period at issue, as it did here." Appx168.

    In addition, Commerce considered that GIIG is the only shareholder that can

individually convene an interim shareholder meeting under Article 43 because it is

the only shareholder with more than 10 percent of shares. Appx127. Article 32(3)

also gives shareholders the right to supervise the company's operations and to put

forward suggestions and raise inquiries. Appx128. Substantial evidence, thus,

supports Commerce's reasoning that this allows GIIG to remain in a supervisory

position over GTC's operations. *Id.*

    Further, Commerce explained that it expects "any large shareholder,

including a government entity, to control the operations of the company in which it

holds the largest number of shares, if its shareholder rights afford it that ability."
Appx126. This was the case here, where "GIIG can control, and has an interest in
controlling, the operations of GTC, and ultimately GTCIE, including the selection
of management and the profitability of companies." *Id.* The trial court held that as
GTC does not have autonomy in the selection of management, it "allows for
{Commerce's} reasonable inference, considering the presumption of government
control in {non-market economy} country proceedings, that their respective
government shareholders maintain the potential to control the export operations of
GTC and its wholly owned subsidiary, GTCIE, because the management of a firm
controls its operations—including its export functions." Appx31. Commerce is
permitted to "draw reasonable inferences from the record evidence." Appx32
(citing *SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 845 (Fed. Cir.
2020), quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933
(Fed. Cir. 1984) for the principle that "substantial evidence includes 'reasonable
inferences from the record.'")). Thus, the trial court correctly found that
"Commerce reasonably could find or infer that GIIG had the power to exert
significant control or influence over the business operations of GTC and its
wholly-owned affiliate, GTCIE, including operations involving exports." *Id.*

Indeed, once Commerce found that Guizhou Tyre failed to satisfy one *de
facto* criterion, and thus, failed to rebut the presumption of government control,

BUSINESS PROPRIETARY INFORMATION DELETED

"Commerce had no further obligation to continue with the analysis." *Zhejiang Quzhou*, 350 F. Supp. 3d at 1321. Nonetheless, to comply with the trial court's remand order, Commerce analyzed the remaining *de facto* factors and determined that Guizhou Tyre also failed to meet the fourth factor – whether the exporter retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses. Appx129.

Specifically, Commerce analyzed that under the Articles of Association, "{t}he Board of Directors shall put forward {an} annual profit distribution proposal{.}" *Id.* The record here demonstrates that GTC's Chairman is [ ███████ ███████████ ] and has a role [ ███████████ ] at [ ███████████ ], and has had that role [ ███████████ ] at the [ ███████████ ] where [ ███████████████ ]. *Id.* Also, when considering the records for the shareholders' meetings during the period of investigation, Commerce observed that GIIG [ ███████████ribution ]-related matters where, again, it had the [ ███ ███████ ] of [ ███████████ ]. *Id.* Indeed, items voted on at the July 2015 shareholder meeting included [ ███████████ ]. *Id.* And although Guizhou Tyre claimed that "GIIG's preferred proposals were voted down" at the May 2015 meeting, "GIIG is the only company with enough shares individually to convene an interim shareholders meeting" and it was later "able to convene an interim meeting only two months later where, representing the vast majority of votes

20

present, GIIG passed the very proposals that failed previously." Appx170. Thus, Commerce determined that GIIG's role in the board selection also impacted profit distribution, and therefore, Guizhou Tyre did not satisfy the fourth *de facto* criterion. Appx129.

In sum, Guizhou Tyre failed to rebut the presumption of government control because, as Commerce explained, the interrelatedness of the various companies, and control of the board and the appointment of management demonstrates the potential control of the company's operations, including export functions. Appx130. Moreover, "GTCIE was not independent from GIIG's exercising control over the distribution of profits, and, thus, . . . GTCIE did not satisfy the fourth factor." Appx31. This Court should affirm the trial court's judgment.

## III.    Guizhou Tyre's Arguments Are Unavailing And Guizhou Tyre Cannot Rebut The Presumption Of Government Control

Overall, Guizhou Tyre provides a confused rendition of Commerce's separate rate analysis in its brief before this Court. *See generally* Guizhou Tyre Br. First, Guizhou Tyre equates Commerce's "presumption" of government control as a separate, distinct, and lower standard from Commerce's "substantial evidence" requirement. Guizhou Tyre Br. at 38-45. This is inaccurate and unfounded, and the jurisprudence Guizhou Tyre cites to support its argument is irrelevant to this issue. Guizhou Tyre also argues that Commerce incorrectly employed the separate rate analysis for majority state-owned entity respondents, *id.* at 23-37, but as the

trial court correctly held, Commerce examined all four *de facto* criteria.  Relatedly, Guizhou Tyre's argument that Commerce relied on insufficient evidence to deny GTCIE's separate rate, *id.* at 46-56, is meritless.

### A.    The Burden To Rebut Government Control Is On The Respondent

Guizhou Tyre argues that it was not required to establish, demonstrate, or satisfy that it is independent from government control.  *Id.* at 44-45.  Instead, it incorrectly flips the burden of establishing an absence of government control to Commerce, arguing that "Commerce was required to affirmatively demonstrate state control."  *Id*.  The jurisprudence on this issue confirms that Guizhou Tyre is wrong.

This Court has repeatedly held that "it is within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and *to place the burden on the exporters to demonstrate an absence of central government control*."  *Sigma Corp.*, 117 F.3d at 1405 (emphasis added); *see also Diamond Sawblades*, 866 F.3d at 1311 (same); *Zhejiang Machinery*, 64 F.4th at 1373 ("the burden lies with {the respondent} to develop a full record and *affirmatively* rebut the presumption") (emphasis added); *Dongtai Peak*, 777 F.3d at 1354 ("under the law for non-market economy countries, all respondents are *presumed* to be subject to governmental control unless they meet the burden of proving otherwise") (emphasis in original).  Thus, Guizhou Tyre's characterization

that it was *Commerce's* burden, rather than Guizhou Tyre's, to affirmatively establish and demonstrate an absence of government control, is directly contrary to this Court's precedent.

Guizhou Tyre also cites *Aukerman Co. v. R. L. Chaides Construction Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992), for the proposition that a presumption of government control "vanishes" once a respondent submits sufficient evidence to support a finding of the nonexistence of the presumed fact. Guizhou Tyre Br. at 38-42. This appears to merely challenge the sufficiency or weight of evidence a respondent submits, which this Court cannot do, *see Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376 (Fed. Cir. 2015), but does *not* undermine this Court's precedents that the burden is *first* on the respondent to demonstrate the absence of government control. *See Sigma Corp.*, 117 F.3d at 1405. Indeed, Guizhou Tyre offers no authority that the "minimum quantum of evidence" standard described in *Aukerman* should apply when an applicant rebuts the presumption of government control in a non-market economy country versus the substantial evidence standard, which is otherwise applied for Commerce's determinations. *See Nippon Steel Corp.*, 458 F.3d at 1352. A "minimum quantum of evidence" would also be contrary to this Court's holding in which a separate rate applicant must "demonstrate an *absence* of central government control." *Sigma Corp.*, 117 F.3d at 1405 (emphasis added).

23

And although Guizhou Tyre argues that *Jilin Forest Industry Jinqiao Flooring Group Co. v. United States*, 617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023), *appeal docketed*, No. 23-2245 (Fed. Cir. Aug. 7, 2023), supports its argument that Commerce should not be afforded deference in applying the presumption of government control, Guizhou Tyre Br. at 38-39, *Jilin*, a case involving an examined or mandatory respondent, is not binding on this Court and, in any event, is on appeal and therefore not final.

Thus, the burden remains on the separate rate applicant to rebut government control in a non-market economy, as the trial court correctly held. *See* Appx30-31, Appx125-126.

## B. Substantial Evidence Supports Commerce's Determination That, Despite Minority Ownership, GTCIE Failed To Rebut The Presumption Of Government Control

Guizhou Tyre next argues that Commerce improperly denied GTCIE's separate rate by applying an analysis relevant for majority-owned respondents, as opposed to minority-owned respondents. Guizhou Tyre Br. at 23-37, 53-57. According to Guizhou Tyre, Commerce needs to demonstrate actual control of export functions in scenarios involving minority ownership. *Id.* at 29-37, 53-57. Guizhou Tyre misinterprets Commerce's practice and relevant legal precedent. Commerce appropriately analyzed GTCIE for minority state ownership.

As a threshold matter, the four *de facto* criteria and the related questions in the separate rate application constitute Commerce's analysis of "export functions" and "export activities." Appx125-126. When Commerce discusses a company's operations in its analysis, it refers to the general operations of a company, which encompass a broad range of business activities, including export functions and activities, management, board meetings, manufacturing, sales, advertising, and marketing. Appx126. Thus, when considering that Guizhou Tyre failed to demonstrate autonomy in the selection of management (*i.e.*, the third factor), the trial court properly gave weight to Commerce's explanation that it is reasonable to infer that government shareholders maintain control of export operations of GTC and GTCIE "because the management of a firm controls its operations, including its export functions." Appx31.

Turning to the level of government ownership in a company (*i.e.*, majority or minority ownership), this consideration entered Commerce's overall separate rate analysis in response to litigation, where the trial court sustained, and this Court affirmed, that majority ownership by a government entity precludes a finding of *de facto* autonomy. *See Adv. Tech. & Materials Co., Ltd. v. United States*, 938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014); *Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 121 F. Supp. 3d 1263, 1267 (Ct. Int'l Trade 2015) ("This revised practice, which was sustained by

this Court and subsequently affirmed by the Court of Appeals, holds that 'where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter or producer,' such majority ownership 'in and of itself' precludes a finding of *de facto* autonomy.").

Thus, Commerce's practice in conducting its separate rate analysis has evolved, but the mere fact that only minority government control exists, as opposed to majority government control, is not dispositive as to whether an exporter rebuts the presumption of government control and does not mean instances of actual control are required. Rather, as discussed above, Commerce's practice is to "examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through minority government ownership under certain factual scenarios." Appx169; *see also 53-Foot Containers from the People's Republic of China*, 80 Fed. Reg. 21,203 (Dep't of Commerce Apr. 17, 2015) (final less-than-fair-value determ.), and accompanying IDM. In doing so, Commerce considers whether there are additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control. *See An Giang Fisheries,* 284 F. Supp. 3d at 1359. Here, Commerce analyzed numerous additional indicia demonstrating that the Chinese government has the ability to exercise control despite minority ownership. *See* Appx136-137.

Notably, the trial court has concluded that in a minority government control scenario, Commerce's determination that an exporter has the ability to exercise control, even if it does not exercise it, is sufficient to establish that the exporter failed to demonstrate its independence from *de facto* government control. *I.D.I.*, 2021 WL 3082807, at *7. Guizhou Tyre attempts to distinguish *I.D.I.* by arguing that, in that case, Commerce made additional factual findings that a Chinese Party member served on the board of the company at issue. Guizhou Tyre Br. at 36-37. However, when addressing the plaintiff's argument in *I.D.I.* that Commerce found only the potential for control, and not actual control, the trial court explained:

> {E}ven if IDI's characterization of Commerce's decision were correct, {Commerce}'s determination that an exporter is potentially controlled by the government—in the sense that the government has the '*ability* to exercise actual control (even without exercising it)'—suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control. A puppet master is no less in control when the strings are slack.

*I.D.I.*, 2021 WL 3082807, at *7.

Moreover, Guizhou Tyre ignores that Commerce in this case analyzed additional indicia of control demonstrating that the Chinese government has the ability to control GTC and GTCIE, and that supposed safeguards in place were ineffective. Appx127-128. For example, "GTC's nomination and voting processes for directors and management under Articles 40, 43, 83, and 117 of its {Articles of Association} allowed the Guiyang SASAC, through GIIG, to influence the board

selection during the {period of investigation}." Appx127. Through these various articles, "GIIG is able to exert control through shareholders' meetings, the selection of directors, and, in turn, the selection of the chairperson." Appx128. Further, as the only shareholder "with more than three percent of shares, GIIG is the only shareholder with the requisite shares to individually put forward proposals for consideration at shareholders' meetings, pursuant to Article 54 of GTC's {Articles of Association}." *Id.* Other articles, such as Articles 32(3) and 49, "allow GIIG to remain in a supervisory position over GTC despite its less-than-majority ownership." *Id.* Thus, despite the facial "safeguards against undue influence," Commerce determined that "GIIG was ultimately able to dominate GTC's decision-making process" and to "appoint its preferred members to GTC's board." *Id.*

Guizhou Tyre argues that Commerce should have employed a holistic analysis in which it considered all four *de facto* criteria to determine whether the government has actual control over GTCIE's export activities. Guizhou Tyre Br. at 24-26, 33. But Commerce *did* consider all four *de facto* criteria, even though the criteria are conjunctive and Commerce "had no further obligation to continue with the analysis" once it found Guizhou Tyre failed to meet one of the factors. *Yantai CMC Bearing Co.*, 203 F. Supp. 3d at 1325-26. In considering the record on all four criteria, Commerce found that Guizhou Tyre satisfied the first two *de facto*

28

factors, but not the third and fourth factors, and thus, did not rebut the presumption of government control. Appx137. Moreover, in minority government control situations, Commerce analyzes additional indicia of control in evaluating whether the government has the *ability* to exercise control, which ultimately informs whether the separate rate applicant has successfully rebutted the presumption of government control. *An Giang Fisheries*, 284 F. Supp. 3d at 1359. Here, Commerce found that there were numerous additional indicia of control, and reasonably concluded that Guizhou Tyre did not rebut the presumption. Appx136-137.

Guizhou Tyre also argues that it submitted substantial evidence rebutting the presumption of government control and that the burden then shifted to Commerce to establish control. Guizhou Tyre Br. at 39-45. In support, it cites certain documents, such as the Company Law of China, the China Code of Corporate Governance, and the Articles of Association. *Id.* at 40-43. However, the trial court correctly found this argument "unconvincing" given the record evidence Commerce relied on in determining that Guizhou Tyre did not rebut the presumption of control. Appx32.

Specifically, the trial court addressed Guizhou Tyre's arguments that nominations and elections of board members were "in compliance with the {Articles of Association} and all applicable legal requirements" and that the board

29

and management owe fiduciary duties to all shareholders. *Id.* However, the trial court explained that "Commerce did not base its determinations on a finding that GIIG or GTC's board of directors did anything improper, inimical to the company's interests, or in derogation of a fiduciary duty." *Id.* Instead, the trial court held that "{t}he evidence concerning the formalities of the nomination process does not refute evidence, including evidence on ownership, the {Articles of Association,} and proprietary information on voting records, . . . that together demonstrate GIIG's ability to control or influence the general business operations of GTC and GTCIE and, specifically, profit distribution." *Id.* (citation omitted). Also, the court held that the record indicates that "GIIG exerted control over GTC's shareholder meetings," and thus, Chinese law, including the Company Law of China and the China Code of Corporate Governance, and the supposed safeguards in the Articles of Association, were ineffective at preventing control by GIIG. *Id.*

Moreover, contrary to Guizhou Tyre's argument that it became Commerce's burden to establish control once it allegedly rebutted the presumption of control (which it did not), *see* Guizhou Tyre Br. at 39-45, it is *not* Commerce's burden to establish government control. Rather, this Court has repeatedly affirmed that it is the *respondent's* burden "to demonstrate an *absence* of central government control." *Sigma Corp.*, 117 F.3d at 1405 (emphasis added); *see Diamond*

*Sawblades*, 866 F.3d at 1304; *Zhejiang Machinery*, 64 F.4th at 1373; *Dongtai Peak*, 777 F.3d at 1354.

In arguing that it rebutted the presumption of control, Guizhou Tyre cites a document from Guiyang SASAC in which Guiyang SASAC allegedly confirms that it does not have authority to make decisions for GTC. Guizhou Tyre Br. at 39. Commerce considered this evidence and concluded that the record demonstrates Guiyang SASAC wholly owns GIIG, which is therefore a state-owned enterprise, and that GIIG was able to vote on the election of the board in place during the period of investigation, as well as the appointment of management and profit distribution. Appx172. Thus, Commerce weighed the import of this evidence and reasonably determined that Guiyang SASAC, through GIIG, was in fact involved in making decisions at GTC, and has the ability to control GTC and GTCIE. *Id.* "Determinations of relative weight of different evidence are generally for the trier of fact," *Rogero v. Sec'y of Health and Human Servs.*, 748 F. App'x 996, 1001 (Fed. Cir. 2018), and the trial court correctly held that this evidence evinced Guiyang SASAC's control over GTC and GTCIE. Appx31-32.

Guizhou Tyre reiterates many of the same points to also argue that Commerce relied on insufficient evidence to deny GTCIE a separate rate. Guizhou Tyre Br. at 46-57. In incorrectly flipping the burden on Commerce to establish that GTCIE was not entitled to a separate rate, Guizhou Tyre argues that the 2012

BUSINESS PROPRIETARY INFORMATION DELETED

and 2015 shareholder meetings do not evidence government control.  *Id.* at 47-53.

However, Commerce relied on more than these meetings in determining that

Guizhou Tyre failed to rebut the presumption of control.  As the trial court held,

Commerce relied on a variety of evidence, "including evidence on ownership, the

{Articles of Association}, and proprietary information on voting records . . . that

together demonstrate GIIG's ability to control or influence the business operations

of GTC and GTCIE."  Appx32.

    With respect to the shareholder meetings themselves, Commerce correctly

found that they were indicative of control.  Specifically, Commerce found that

GIIG's [        ] were [        ] of those [        ] at the [        ], in which members of GTC's nomination committee  [        t        ] as directors and were elected.  Appx128, Appx167.  At the time of the

investigation, these directors still comprised the board's [        ].  Appx1436.  Additionally, there was also interrelatedness between the

[        ] and [        ] of [        ] and [        ], demonstrating the

ability to control GTCIE.  *Id.*

    This information is especially significant given a series of events in 2015

that demonstrate GIIG's control over GTC's and GTCIE's selection of

management.  In May 2015, "GIIG's preferred proposals were voted down."

Appx170.  However, in July 2015, GIIG's preferred proposals were passed, when

BUSINESS PROPRIETARY INFORMATION DELETED

it was the [          ] of [          ], despite [          ].

Appx128-129.  Thus, Commerce considered that only GIIG individually has the

requisite number of shares to convene a shareholder meeting and reasoned that

GIIG can therefore convene meetings on its favored proposals until they prevail,

which happened at the July 2015 meeting.  Appx126-132.  Indeed, "Commerce

concluded that GIIG's ability to force an interim meeting to re-vote on its favored

proposals that did not pass was evidence of GIIG's control, and this control related

to proposals directly relevant to the factors Commerce considers when evaluating

*de facto* independence, *i.e.*, profit distribution and selection of management."

Appx171; *see also* Appx173 ("Regarding profit distribution, as GTC states, a plan

would be put to a meeting open to all shareholders, but in this case, GIIG called an

interim meeting once its preferred proposals failed.").  Contrary to Guizhou Tyre's

argument, the 2012 and 2015 shareholder meetings are examples of the additional

indicia of control Commerce considered, which support the trial court's holding

that "Commerce acted upon a sufficient basis in the record evidence when it denied

separate rate status to GTCIE."  Appx33.

　　　Ultimately, Guizhou Tyre's arguments amount to a disagreement with the

results of Commerce's reasoned analysis of Guizhou Tyre's failure to rebut the

presumption of government control.  Guizhou Tyre essentially invites the Court to

reweigh the factual record, which this Court may not do.  *See Downhole Pipe*, 776

F.3d at 1376; *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999) (the standard of review "does not allow {the Court} to substitute {its} judgment for that of Commerce . . . nor does it allow the parties to retry factual issues . . . *de novo*").

Finally, Guizhou Tyre argues that Commerce arbitrarily reversed its separate rate determination because in a different proceeding, Commerce granted GTCIE a separate rate when the percentage of government control was higher than in the instant case.  Guizhou Tyre Br. at 57-60 (citing *Off-the-Road Tires from China*, 80 Fed. Reg. 20,197 (Dep't of Commerce Apr. 15, 2015) (final admin. review) (*OTR Tires AR5*)).  An agency acts arbitrarily "when the agency offer{s} insufficient reasons for treating similar situations differently."  *SKF USA Inc v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  Here, however, Commerce explained that it was "not dispositive" that GTC may have been eligible for a separate rate during an earlier period in another proceeding.  Appx169; *see also New Mexico Garlic Growers Coal. v. United States*, 352 F. Supp. 3d 1281, 1289 (Ct. Int'l Trade 2018) (explaining even in situations involving the same proceeding (*i.e.*, the same order), an entity must submit a separate rate in each segment of the proceeding and "for an entity who received a separate rate in the most recent segment of the proceeding, a certification that the entity *continues* to meet the criteria for obtaining a separate rate.") (emphasis added).  Additionally, Guizhou Tyre overlooks that, two

34

administrative reviews later, Commerce found that GTCIE is *not* eligible for a separate rate based on a factual situation that is very similar to this investigation. *See Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 13,733 (Dep't of Commerce Apr. 21, 2017) (final admin. review), and accompanying IDM at Cmt. 1B ("In the instant case, the Department finds the provisions do not ensure the absence of the *de facto* control of the selection of management or profit distribution schemes by certain shareholders. Specifically, the provisions still allow Guiyang SASAC through GIIG, the authority to make decisions for GTC, which appoints GTCIE's senior management, as well as sets GTCIE's business operations agenda. Therefore, we continue to find that GTC is not eligible for a separate rate in this review.").[2]

Moreover, Commerce's differing conclusions between *OTR Tires AR5* and the investigation at issue here are not unexplained, and instead reflect the reasonable evolution of Commerce's analysis based on court decisions. Appx169. As Commerce explained, "following litigation before the {trial court} and the Federal Circuit, it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through minority government ownership under certain factual

---

[2] Commerce's separate rate determination in this case is also in litigation in a related case before this Court. *See Guizhou Tyre Co., Ltd. v. United States*, Court No. 23-2163 (Fed. Cir.).

scenarios." Appx129 (quotations and citations omitted). Indeed, the trial court rejected Guizhou Tyre's claim because Commerce adequately "explained that its {separate rate} practice has evolved" based on court decisions. Appx33. Thus, the trial court correctly held that GTCIE failed to rebut the presumption of government control. Appx30-33; *see also* Appx126-140, Appx155-164, Appx166-174. This decision should be affirmed.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the trial court.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

ELIO GONZALEZ
Senior Counsel
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce

/s/ Kara W. Westercamp
KARA W. WESTERCAMP
Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Tel: (202) 305-7571

36

Email:
kara.m.westercamp@usdoj.gov
Washington, DC 20044

February 29, 2024

*Attorneys for Defendant-Appellee,*
*United States*

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 29th day of February, 2024, a copy of the foregoing was filed electronically.

This filing was served electronically on all parties by operation of the Court's electronic filing system.

/s/ Kara W. Westercamp
KARA W. WESTERCAMP

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(B), the undersigned certifies that this

brief contains 7,961words, excluding the parts of the brief exempted by this rule.

The brief complies with the typeface requirements and type style requirements of

Fed. R. App. P. 32(a)(5) and has been prepared using Times New Roman, 14-point

font, proportionally spaced typeface.


/s/ Kara W. Westercamp
KARA W. WESTERCAMP