**2023-2165**

IN THE

# United States Court of Appeals
# for the Federal Circuit

GUIZHOU TYRE CO., LTD.,
GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.,

Plaintiffs-Appellants,

CHINA MANUFACTURERS ALLIANCE LLC, SHANGHAI HUAYI GROUP
CORPORATION LIMITED, fka Double Coin Holdings Ltd.,

Plaintiffs,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
Case No. 19-cv-00031, Senior Judge Timothy C. Stanceu

**NON-CONFIDENTIAL REPLY BRIEF FOR PLAINTIFF-
APPELLANTS GUIZHOU TYRE CO., LTD. AND
GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.**

Ned H. Marshak*
Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
(202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel to Plaintiff-Appellants
Guizhou Tyre Co., Ltd. and Guizhou
Tyre Import and Export Co., Ltd.*

Dated:  April 18, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 23-2165

**Short Case Caption** Guizhou Tyre Co., Ltd. v. US

**Filing Party/Entity** Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  April 18, 2024

Signature:  /s/ Ned H. Marshak

Name:  Ned H. Marshak

**FORM 9. Certificate of Interest**

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Guizhou Tyre Co., Ltd. | | |
| Guizhou Tyre Import and Export Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable      ☐    Additional pages attached

| | | |
|---|---|---|
| Brandon M. Petelin | Elaine F. Wang | Andrew T. Schutz |
| Mark E. Pardo | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable      ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

I.    THE GOVERNMENT MISAPPLIES THE PRESUMPTION OF GOVERNMENT CONTROL IGNORING THE FACT THAT SUCH PRESUMPTION "BURSTS LIKE A BUBBLE"...........................................2

II.   GTC REBUTTED THE PRESUMPTION OF STATE CONTROL..............7

III.  COMMERCE'S SEPARATE RATE DENIAL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE......................................................11

IV.   COMMERCE IMPROPERLY USED THE SEPARATE RATE ANALYSIS FOR MAJORITY SOE-OWNED RESPONDENTS....................................16

V.    COMMERCE ARBITRARILY REVERSED ITSELF ...............................21

CONCLUSION ...........................................................25

## CONFIDENTIAL MATERIAL OMITTED

The confidential material deleted on pages 12 and 14 consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, Appxi-iv, the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
284 F.Supp.3d 1350 (CIT 2018)...........................................................16, 17, 19

*Aukerman Co. v. R.L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ...................................................*passim*

*China Mfgrs. Alliance, LLC v. United States*,
639 F.Supp.3d 1260 (CIT 2023).........................................................16

*China Mfgrs. Alliance, LLC v. United States*,
639 F.Supp.3d 1260 (CIT 2023).........................................................21

*Diamond Sawblades Mgrs. Coal. v. United States*,
866 F.3d 1304 (Fed. Cir. 2017) .....................................................16, 25

*Dongtai Peak Honey Indus. Co. v. United States*,
777 F.3d 1343 (Fed. Cir. 2015) ...........................................................4

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).........................................................................23

*Guizhou Tyre Co. v. United States*,
641 F.Supp.3d 1386 (CIT 2023)....................................................12, 15

*Guizhou Tyre Co. v. United States*,
641 F.Supp.3d 1371 (CIT 2023).........................................................22

*Guizhou Tyre Co. v. United States*,
557 F.Supp.3d 1302 (CIT 2022).........................................................15

*Hyundai Elecs. Indus. Co. v. United States*,
899 F.2d 1204 (Fed. Cir. 1990) .........................................................23

*I.D.I. Int'l Dev. & Inv. Corp. v. United States*,
2021 WL 3082807 (CIT July 6, 2021) ................................................19

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
    28 F.Supp.3d at 1317 (CIT 2014)....................................................18, 19

*Jilin Forest Indus. Jinqiao Flooring Grp. v. United States*,
    617 F.Supp.3d 1343 (CIT 2023)........................................................6, 7

*Lucent Tech., Inc. v. United States*,
    580 F.3d 1301 (Fed. Cir. 2009) .........................................................20

*New Mexico Garlic Growers Coal. v. United States*,
    352 F.Supp.3d 1281 (CIT 2018)........................................................22

*Sigma Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) ...................................................5, 6, 11

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) .........................................................22

*WelCom Prods., Inc. v. United States*,
    865 F.Supp.2d 1340 (CIT 2012).........................................................23

*Yantai CMC Bearing Co. v. United States*,
    203 F.Supp.3d 1317 (CIT 2017).........................................................16

*Zhejiang Mach. Imp & Exp. Corp. v. United States*,
    64 F.4th 1364 (Fed. Cir. 2023) ........................................4, 16, 18, 25

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*,
    350 F.Supp.3d 1308 (CIT 2018)....................................................16, 17

**Rules**

Federal Rules of Evidence 301 ...........................................................3, 7

**Other Authorities**

Wex Legal Dictionary, LEGAL INFORMATION INSTITUTE, available at:
    https://www.law.cornell.edu/wex/presumption................................4, 6

**Administrative Decisions**

*Circular Welded Carbon Quality Steel Line Pipe from China*,
    74 Fed. Reg. 14,514 (Mar. 31, 2009) (final determination) ...............24

*Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629
(Sept. 14, 2006) (final results) ............................................................12, 14, 24

*Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632
(Sept. 28, 2001) (final determination) .................................................24

*New Pneumatic Off-The-Road Tires from China*, 80 Fed. Reg. 20,197
(Apr. 15, 2015) (final results) ..............................................................21

*Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335
(Apr. 19, 2010) (final determination) ....................................................24

*Pea Protein from China*, 89 Fed. Reg. 10,038 (Feb. 13, 2024)
(preliminary determination) ..................................................................25

*Silicon Carbide from China*, 59 Fed. Reg. 22,585 (May 2, 1994)
(final determination) .....................................................................12, 14

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474
(Sept. 9, 2016) (final results) ................................................................24

*Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992
(Dec. 26, 2012) (final determination) ....................................................24

# INTRODUCTION

In its Opening Brief, Plaintiffs-Appellants Guizhou Tyre Co., Ltd. ("GTC") and Guizhou Tyre Import and Export Co., Ltd. ("GTCIE") (collectively, "Guizhou")[1] demonstrated that the U.S. Department of Commerce ("Commerce" or "Department") unlawfully denied separate rate status for GTCIE in the less-than-fair-value ("LTFV") investigation leading to the antidumping duty ("ADD") order on truck and bus tires ("TBT") from the People's Republic of China ("China" or "PRC"). Guizhou Opening Brief (Dec. 1, 2023), ECF 22-23 ("Guizhou Br."). Commerce improperly:

- employed the separate rate analysis for respondents that are majority-owned by state owned enterprises ("SOE"), notwithstanding that Guizhou is only 25.2% SOE-owned. *Id*. at 23-37;

- found that the presumption of state control, long recognized by this Court, had not been rebutted notwithstanding extensive record evidence that Guizhou was independent from the Chinese government. *Id*. at 38-45;

- did not rely on substantial evidence necessary to deny GTCIE's separate rate. *Id*. at 46-57; and

- reversed itself from prior ADD proceeding in which GTC was granted a separate rate despite having 33.84% SOE-ownership. *Id*. at 57-60.

These demonstrations are not undermined by the Response Brief filed by

---

[1]    GTC produced the subject merchandise exported to the United States by its wholly-owned affiliate GTCIE, and both participated in the administrative proceeding resulting in GTCIE's separate rate denial.

Defendant-Appellee United States ("Government"). Corrected Response Brief

(Mar. 19, 2024), ECF 34-35 ("Gov. Br."). As set forth in turn below:

1. the Government misapplied the presumption by requiring that GTCIE conclusively demonstrate an absence of potential government control when—per the required application of rebuttable presumptions—only a minimum quantum of contrary evidence need be proffered;

2. GTCIE rebutted the presumption with a plethora of evidence demonstrating an absence of state control, including the government entity owning the SOE proclaiming that it did not control GTCIE, financial statements so attesting, the SOE being unable to pass resolutions at GTC's May 2015 meeting, and certified statements of non-control supported by substantial documentation and legal protections;

3. Commerce's separate rate denial was not supported by substantial evidence, as the SOE voting to elect GTC's board in 2012—years before the period of investigation ("POI")—and pass proposals at GTC's July 2015 meeting—after they were voted down in May 2015—do not reasonably establish that GTCIE's export activities were actually controlled by the Chinese government;

4. Commerce improperly employed the separate rate analysis used to determine whether majority SOE-owned respondents should be granted separate rate status, when this analysis does not extend to respondents with minority SOE-ownership; and

5. Commerce arbitrarily reversed its separate rate practice, as evidenced by its prior grant of a separate rate for GTC when it had significantly greater SOE-ownership and ownership than it had in this POI.

## I.  THE GOVERNMENT MISAPPLIES THE PRESUMPTION OF GOVERNMENT CONTROL IGNORING THE FACT THAT SUCH PRESUMPTION "BURSTS LIKE A BUBBLE"

The Government properly identifies the overarching issue in this case,

whether "Commerce's determination that {GTCIE} failed to rebut the presumption

of *de facto* government control is supported by substantial evidence and in accordance with law." Gov. Br. at 1. The Government further correctly explains that this "Court has repeatedly sustained Commerce's use of the rebuttable presumption of government control in non-market economies." Gov. Br. at 4. The Government, however, ignores the manner in which this Court, decades ago, reasoned how presumptions operate under the Federal Rules of Evidence ("FRE"):

> Rule 301 embodies what is known as a **bursting bubble theory** of presumptions. Under this theory, a presumption is not merely rebuttable but **completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of a presumed fact into genuine dispute. **The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases added) (citations omitted).

The Government misapplies the presumption of state control by miscasting it as a burden on respondents to completely disprove potential government control. It claims that "Guizhou Tyre offers no authority that the 'minimum quantum of evidence' standard described in *Aukerman* should apply when an applicant rebuts the presumption of government control in a non-market economy country." Gov. Br. at 24. Contrary to the Government's claim, authority for applying the *Aukerman* standard is found in the legal definition of the term "presumption":

- 3 -

> Presumption is a legal inference that must be made in light of certain facts. . . . ; **a party challenging it can overcome the presumption by providing the appropriate burden of proof**.
>
> **Most presumptions are rebuttable, meaning that they are rejected if** proven to be false or at least **thrown into sufficient doubt with evidence**.

Wex Legal Dictionary, LEGAL INFORMATION INSTITUTE, available at:

https://www.law.cornell.edu/wex/presumption (emphases added).

This Court's precedent cited by the Government, Gov. Br. at 23, confirms that the *Aukerman* standard and legal definition of the presumption of government control apply in this case:

- "the burden lies with {the respondent} to develop a full record and **affirmatively rebut the presumption**." *Zhejiang Mach. Imp & Exp. Corp. v. United States*, 64 F.4th 1364, 1371 (Fed. Cir. 2023) ("*ZMC*") (emphasis added); and

- "under the law for non-market economy countries, all **respondents are *presumed* to be subject to governmental control unless they meet the burden of proving otherwise**." *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1354 (Fed. Cir. 2015) (emphasis modified).

These statements are entirely consistent with *Aukerman*: "respondents are *presumed* to be subject to governmental control unless they" "affirmatively rebut the presumption" by providing "evidence . . . sufficient to put the existence" government control "into genuine dispute." *Id*. (emphasis in original); *ZMC*, 64 F.4th at 1371; *Aukerman*, 960 F.2d at 1037.

- 4 -

The Government misplaces reliance on this Court's first case adjudicating
Commerce's presumption of government control. Gov. Br. at 23. In *Sigma Corp. v.
United States*, this Court affirmed "Commerce's authority to employ a presumption
of state control for exporters in a nonmarket economy and to place the burden on
the exporters to demonstrate an absence of central government control." 117 F.3d
1401, 1405 (Fed. Cir. 1997). This statement does not require that respondents
conclusively establish an absence of government control. First, *Sigma* affirmed the
Department's separate rate denial because the "evidentiary showing was
**insufficient to overcome the presumption**." *Id*. at 1407 (emphasis added).
Moreover, the facts of *Sigma* confirm that the respondent in that case failed to
satisfy the threshold, minimal evidentiary requirement:

> Commerce noted that {exporter} **Guangdong "provided almost no
> evidence on the record** establishing that it negotiated prices or sales
> with its customers, or that it was actually responsible for its profits or
> losses." . . . . **Guangdong provided only a certification** from its
> parent corporation attesting that Guangdong acted independently . . . .
> Commerce concluded that such a certification, "standing alone
> **without any supporting documentation** does not establish the
> absence of *de facto* control."

> Commerce noted that Guangdong had submitted copies of its 1986
> and 1988 business licenses in an effort to demonstrate its
> independence. . . . As Commerce concluded, however, the 1988
> business license does not "establish clear independence from the
> parent corporation," as it "describes the scope of Guangdong's
> business activities without identifying the government's role in those
> activities," and fails to prove the absence of *de facto* government
> control with respect to export sales and pricing decisions.

> **It was proper for Commerce to require . . . more** to establish
> Guangdong's independence of the central government. . . . In view of
> the presumption that an exporter in a nonmarket economy country is
> part of the national corporation and Commerce's reasonable
> conclusion that {importer} D & L's evidentiary showing was
> insufficient to overcome that presumption, we affirm . . . . .

*Id.* at 1406-07 (emphases added). Given that the scant evidence proffered in *Sigma*

was "insufficient to overcome the presumption," *Sigma* does not stand for the

proposition that respondents are only entitled to separate rates if they conclusively

establish "an absence of central government control." *Id*. at 1405.

In this appeal, Guizhou asks this Court to reconcile the *Aukerman* rebuttable

presumption and substantial evidence standards. Before this Court assesses

whether Commerce's finding that GTCIE failed to rebut the presumption is

supported by substantial evidence, it needs to decide whether the presumed state

control was "**thrown into sufficient doubt**." Wex Legal Dictionary (emphasis

added). To overcome the presumption for GTCIE, Guizhou needed only to submit

"**evidence sufficient to support a finding of the nonexistence of the presumed**

**fact**"—*i.e.*, that was not controlled by the Chinese government. *Aukerman*, 960

F.2d at 1037 (emphasis added).

In deciding these issues, this Court should adopt the U.S. Court of

International Trade ("CIT") rationale in *Jilin Forest Indus. Jinqiao Flooring Grp.*

*v. United States*, 617 F.Supp.3d 1343 (CIT 2023), *appealed as* Fed. Cir. Case No.

23-2245. The CIT in *Jilin Forest* found that "Commerce has failed to provide a

- 6 -

lawful justification for its use of the NME presumption." *Id*. at 1369. In reaching this conclusion, the CIT expressed concern as to "the crux of Commerce's argument, *i.e.*, that somehow, apart from other executive agencies, it has special powers that free it from the constraints placed upon other agencies that must identify a statutory or regulatory source of their actions." *Id*. at 1367. The CIT in *Jilin Forest* also emphasized recent judicial precedent undermining the presumption: "Recent cases also suggest that the wind is blowing against wide-ranging claims for deference." *Id*.

*Jilin Forest* establishes that, at minimum, Commerce lacks discretion to implement the rebuttal presumption of state control in a manner contrary to that proscribed by FRE 301. Commerce does not have "special powers that free it from the constraints placed upon other agencies" with respect to rebuttal presumptions. *Id*. While Commerce's discretion may be further curtailed in the event that *Chevron* is revisited, Guizhou Br. at 21 n.4, Commerce currently cannot disregard the *Aukerman* standard; that is, as with all legal rebuttal presumptions, the presumption of state control bursts like a bubble upon the introduction of sufficient contrary evidence.

## II.    GTC REBUTTED THE PRESUMPTION OF STATE CONTROL

GTC submitted information far surpassing the requisite "minimum quantum of evidence" establishing its independence from the Chinese government.

*Aukerman*, 960 F.2d at1037. Guizhou provided a formal clarification of GTC's relationship with Guiyang Industry Investment (Group) Co., Ltd. ("GIIC" or "GIIG"), which owns 25.2% of Guizhou and is under the supervision of the Guiyang State-owned Assets Supervision and Administration Commission ("SASAC"). Guizhou Rebuttal Factual Information (May 6, 2016) ("May 2016 RFI"), at 2, Exhibit 1 ("Guiyang SASAC Clarification"), Appx352, Appx370-371. The Guiyang SASAC "**confirmed that it does not have the authority to make decisions for GTC**. . . . **Guiyang SASAC, which has an interest in {GTC}, does not have the right to make a decision on appointment or dismissal of board directors or management of {GTC}**." *Id*. at 2, Exhibit 1 (emphases added), Appx352, Appx370. Similarly, GTC's 2015 Annual Report provided:

> The Company . . . **completely separates from the controlling shareholder {GIIC} in personnel, assets and finance**, etc., with independent organization and independent business. **The controlling shareholder strictly abides by the provisions of laws** and regulations and exercise shareholders' rights pursuant to laws.

GTCIE Separate Rate Application Supplemental Response (July 8, 2016) ("SSRA"), Exhibit 4 (emphases added), Appx861.

Guizhou also detailed how the SOE's proposals were rejected at the 2014 Annual General Meeting ("May 2015 Meeting"). At that time, proposals to appoint two directors and preliminarily distribute profits advanced by GIIC failed. GTCIE Separate Rate Application Second Supplemental Response (July 22, 2016)

("2SSRA"), Exhibit 3D-F, Appx1301-1377. This occurrence, regardless of what subsequently transpired, rebuts the presumption that Guizhou is controlled by the Chinese government through its SOE shareholder.

Further support for GTCIE's independence was provided in multiple responses attesting to its independence, each of which were certified as "accurate and complete" and accompanied by supporting documentation, where applicable. Guizhou Separate Rate Application (Apr. 8, 2016), Appx243; SSRA, Appx542-543; 2SSRA, Appx1212-1213. These certified statements of GTCIE include:

- "neither Guiyang SASAC nor GIIC is involved in GTC's or GTCIE's daily operation.";

- "managers and board of director members of its entity shareholder do not have any relationship with any level of government or government agencies.";

- "its export prices are not set by, subject to the approval of, or in any way controlled by a government entity at any level.";

- "it has independent authority to negotiate and sign export contracts and other agreements.";

- "it has autonomy from all levels of the government . . . and from any government entities in making decisions regarding the selection of management."; and

- "it retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses."

SRA at 13-17, Exhibits 10-11, Appx233-237, Appx305-326, Appx327-337.

GTCIE also provided substantial evidence that, as a publicly listed company, there existed significant legal restrictions on all shareholders—including GIIC—to ensure that they abide by the procedures applicable to all investors. *See* May 2016 RFI Exhibit 2: PRC Company Law, Appx373-421, Exhibit 3: PRC Code of Corporate Governance for Listed Companies ("PRC Code"), Appx423-440, Exhibit 4: GTC Articles of Association ("AoA"), Appx494-536. Such "evidence show{s} that the only way in which GIIC may participate in GTC's decision-making is through normal courses available to all shareholders." *Id*. at 2, Appx1381; Guizhou Case Brief (Dec. 6, 2016), at 18, Appx1464. These legal requirements and safeguards include:

- GTC AoA 40 with PRC Company Law Articles 3 and 99 provide strict election procedures, through which GTC board members were elected democratically and transparently by shareholders, and its chairman was elected by the board;

- PRC Code Articles 20-21 limit controlling shareholders, prohibiting GIIC from either circumventing the shareholders' meetings or the board of directors in selecting management or interfering with GTC or other shareholders;

- GTC AoA 83 limits GIIC from nominating more than one third of GTC's directors; in fact, the 6th Board was nominated in 2012 by the previous board—without GIIC/Guiyang SASAC involvement;

- GTC AoA 57, 83, and 88 provide for strict voting procedures, allowing cumulative voting to prevent GIIC from controlling GTC elections and internet voting to maximize participation; and

- GTC AoA 124, 130, 132, and 134 provide strict election procedures for senior management, through which board members selected GTC's management.

May 2016 RFI Exhibit 2: PRC Company Law, Appx374, Appx397, Exhibit 3:

PRC Code, Appx428, Exhibit 4: GTC AoA, Appx502-507, Appx512-514,

Appx522-524; Guizhou Case Brief at 19-23, Appx1465-1469.

The presumption of GTCIE being state-controlled "**completely vanish{ed}**"

because Guizhou submitted "evidence sufficient to support a finding of the

nonexistence of the presumed fact." *Aukerman*, 960 F.2d at 1037 (emphases

added). By contrast, the respondent in this Court's seminal *Sigma* case "provided

almost no evidence"—"only a certification" and "business licenses in an effort to

demonstrate its independence." 117 F.3d at 1406. In light of the plethora of

evidence supporting GTCIE's independence, the presumption burst. Such ordinary

operation of presumption law does not "incorrectly flip{} the burden of

establishing an absence government control to Commerce" as the Government

argues. Gov. Br. at 23. Rather, Commerce unlawfully denied GTCIE's separate

rate because the presumption was in fact rebutted.

## III.   COMMERCE'S SEPARATE RATE DENIAL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

With Guizhou's evidence bursting the presumption, the issue on appeal

narrows to whether Commerce's separate rate denial is supported by substantial

evidence—*i.e.*, without considering the presumption. Critically, Commerce's

longstanding separate rate analysis implemented in this investigation evaluates

CONFIDENTIAL INFORMATION DELETED

"government control over . . . **export activities**" and requires evidence of "**actual control**" instead of mere "potential control." Guizhou Br. at 25-26; U.S. Department of Commerce Memorandum (Aug. 26, 2016) ("Separate Rate Memo"), at 2 (emphasis added), Appx1434; *Silicon Carbide from China*, 59 Fed. Reg. 22,585, 22,587 (May 2, 1994) (final determination); *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006) (final results), Issues and Decision Memorandum ("IDM") Comment 3 (emphases added).

The scant evidence relied upon by Commerce does not reasonably support the conclusion that GTCIE's export activities were actually controlled by the Chinese government. Commerce first heralds GTC's 2012 Meeting: "GIIG's [action] were [description] of those [description], when "directors were elected" that still comprise the board's [description]. Gov. Br. at 33 (citing *Guizhou v. United States*, 641 F.Supp.3d 1386, 1395 (CIT 2023) ("*Guizhou II*"), Appx32). These facts cannot reasonably support Commerce's finding that the Chinese government controlled GTCIE, let alone its export activities, because:

- GIIG, the SOE that owns 25.2% of Guizhou, was not involved in nominating director candidates. SSRA at 1, Appx1217;

- the elected GTC board members "do not have any position in GIIG or SASAC or any other government agency." Guizhou Case Brief at 18, Appx1464.

- the 2012 Meeting election complied with all legal requirements proscribed by GTC's AoA, the PRC Company Law, and PRC Code— including protections against domination by any one shareholder.

Guizhou Br. at 48; May 2016 RFI Exhibits 2-4, Appx375-382, Appx424-429, Appx500-524; and

- the 2012 Meeting predated the July through December 2015 POI, and Commerce in this investigation declined to rely on documents that "predate the POI." IDM at 28, Appx64.[2]

Commerce thereby lacked a basis to deny GTCIE's separate rate based on GIIG having, years before the POI, democratically and transparently through a legally constrained process voted to elect GTC directors—none of whom GIIG nominated.

The Government asserts that "GIIG is *only* shareholder to own more than one percent of GTC's voting shares." Gov. Br. at 16 (emphasis in original). This claim is factually inaccurate; two other such entities exist. 2SSRA Exhibit 2, Appx1271. The fact that smaller entities are able to together convene shareholder meetings refutes Commerce's reliance on GTC's AoA to deny GTCIE's separate rate. *See* Gov. Br at 19, 21; Final Redetermination (Apr. 25, 2022) ("Remand"), at 11, 54-55, Appx127, Appx170-171. These AoA ensure "that the only way in which GIIC may participate in GTC's decision making is through the normal courses available to all shareholders. There is **absolutely no record evidence of any instance of 'control' over the operations or export activities** of GTC or

---

[2]     The Government responds that holding the Department to this statement "would leave Commerce unable to consider government involvement in selecting a board if that involvement pre-dated the {POI}." Gov Br. at 18 (quoting Remand at 52, Appx168). This slippery slope argument has no merit as to Guizhou, given that Commerce granted its separate rate for that earlier time period. Section V, *infra*.

- 13 -

CONFIDENTIAL INFORMATION DELETED

GTCIE." May 2016 RFI at 2, Appx1381 (emphasis added).

The gravamen of Commerce's state control finding was that "in July 2015, GIIG's preferred proposals were passed, when it was the [description] of shares present, despite [description]." Gov. Br. at 33. According to Commerce, such actions were "relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management." *Id*. at 34; Remand at 55, Appx171. However, this separate rate denial lynchpin is devoid of a nexus between GIIG's voting and the SOE having "actual control" over GTCIE's "export activities"—long recognized tenants of the separate rate analysis. Guizhou Br. at 25-26; Separate Rate Memo at 2 (emphasis added), Appx1434; *Silicon Carbide from China*, 59 Fed. Reg. at 22,587; *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,269, IDM Comment 3.

Moreover, Commerce's conclusion is rebutted by the critical fact that, two months earlier: "In May 2015, 'GIIG's preferred proposals were voted down.'" Gov. Br. at 33 (quoting Remand at 54, Appx170). These meetings, therefore, do not constitute "a series of events in 2015 that demonstrate GIIG's control" sufficient to deny GTCIE separate rate. *Id*. The SOE being unable to pass its preferred proposals constitutes **substantial evidence that Guizhou is not ultimately beholden to GIIG**. That these proposals subsequently were passed does not establish actual government control over GTCIE's export activities, the

essential prerequisite for separate rate denial. The 2015 GTC meetings demonstrate that GIIC participated transparently and democratically through normal procedures, subject to legal restrictions. As such, Commerce improperly misconstrues the ordinary operations of a company that is 25.2% owned by an SOE as a basis to deny GTCIE's separate rate.

The Government heralds the CIT finding that "Commerce did not base its determinations on a finding that GIIG or GTC's board of directors did anything improper, inimical to the company's interests, or in derogation of a fiduciary duty." Gov. Br. at 31 (quoting *Guizhou II*, 641 F.Supp.3d at 1396, Appx32). These finding do not support Commerce's decision. As an initial matter, Commerce in fact rested its original separate rate denial on the discredited finding that the July 2015 Meeting was not open to all shareholders. *Guizhou v. United States*, 557 F.Supp.3d 1302, 1317-18 (CIT 2022), Appx14; IDM at 27, Appx63; Remand at 8, Appx124. Commerce thereafter continued denying GTCIE's separate rate, undeterred by the fact that all relevant meetings "were available to all shareholders." Remand at 8, Appx124.

Moreover, Guizhou's separate rate eligibility does not hinge on GIIG having done "anything improper, inimical to the company's interests, or in derogation of a fiduciary duty." *Guizhou II*, 641 F.Supp.3d at 1395 (CIT 2023), Appx32. With Guizhou having rebutted the presumption, Section II, *supra*, Commerce could only

deny GCTIE's separate rate by relying on substantial evidence supporting its finding of actual government control over export activities. The ordinary operations of a company with a one-quarter SOE ownership does not suffice, and only resulted in denial because Commerce improperly extended the separate rate analysis for majority SOE-ownership to GCTIE, as shown below.

## IV.    COMMERCE IMPROPERLY USED THE SEPARATE RATE ANALYSIS FOR MAJORITY SOE-OWNED RESPONDENTS

The Government relies heavily on precedent affirming Commerce's summary separate rate denial for majority SOE-owned respondents, without the need to establish a direct nexus to actual control over export activities. Gov. Br. at 3-4, 13-14, 22-31; *Diamond Sawblades Mgrs. Coal. v. United States*, 866 F.3d 1304, 1307 (Fed. Cir. 2017) ("*DSMC*"); *China Mfgrs. Alliance, LLC v. United States*, 639 F.Supp.3d 1260, 1264 (CIT 2023); *ZMC*, 65 F.4th at 1368; *Yantai CMC Bearing Co. v. United States*, 203 F.Supp.3d 1317, 1317-26 (CIT 2017); *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308 (CIT 2018). The CIT in the majority SOE-ownership context recognizes that:

- **"a majority government shareholder will not be able to rebut the presumption of government control because** . . . notwithstanding a lack of evidence of actual control, **the majority shareholder is constantly in possession of the ability to exercise actual control**." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350, 1357 (CIT 2018) ("*An Giang II*") (emphases added); and, relatedly

- **the *Aukerman* standard is "unhelpful"** to such respondents attempting to establish separate rate eligibility. *Zhejiang Quzhou*, 350 F.Supp.3d at 1323 (emphasis added).

These CIT decisions found that majority SOE-owned respondents cannot rebut the presumption of state control.

By contrast, the CIT recognizes that minority SOE-owned respondents such as Guizhou can rebut the presumption, as their separate rate denial must be supported by "more indicia of control" beyond 'potential control.'" *An Giang II*, 284 F.Supp.3d at 1361; Guizhou Br. at 29-33. Commerce failed to heed this distinction, denying GTCIE's separate rate upon finding that "control of the board and the appointment of management **demonstrates the potential control of** the company's operations, including **export functions**." Gov. Br. at 22 (emphases added) (citing Remand at 14, Appx130). Commerce purports to have "analyzed additional indicia of control," but its evidentiary basis distills to the July 2015 meeting, where "supposed safeguards in place were ineffective." Gov. Br. at 28, 33 (citing Remand at 11-13, Appx127-128). Commerce tellingly disregarded the Guiyang SASAC Clarification because of the July 2015 vote. Gov Br. at 31 (citing Remand at 56, Appx172).

Reviewing courts have affirmed Commerce's rationale that the normal operation of respondents with majority SOE shareholders is sufficient to deny separate rates without evidence that the SOE actually controls export activities.

Guizhou Br. at 26-29. However, evidence of actual control is necessary to deny separate rates for minority SOE-owned respondents, such as Guizhou. *Id*. at 29-33.

The Government next claims that each *de facto* criterion can be evaluated in isolation, and that a separate rate for a minority-owned SOE can be denied if merely one of the four factors is not satisfied. Gov. Br. at 14. Commerce correctly concedes that the record undisputably evidences **"no indication of direct involvement or approval on behalf of any government authority regarding price-setting** (the first factor)" and that GTCIE "**has authority to negotiate and sign contracts and other agreements** on its own behalf (the second factor)." Remand at 19, 21 (emphases added), Appx135, Appx137. Yet this Court has only recognized that separate rates for majority SOE-owned respondents may be denied based on the SOE having "the power to select managers and keep the profit distribution—factors that Commerce has considered in establishing the presumption of de facto control." *ZMC*, 65 F.4th at 1372.

This Court should decline to extend *ZMC*; rather, all factors should remain relevant in evaluating the separate rate eligibility in the minority SOE-ownership context. Commerce's separate rate analysis historically "**consider{s} the totality of circumstances.**" *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d at 1317, 1339 n.160 (CIT 2014) (emphasis added). The truncated analysis used to deny GTCIE's separate rate, in which each factor is evaluated in

isolation and those favoring eligibility are ignored, is anathema to "considering the totality of the circumstances." *Id*. This truncated approach may be appropriate for majority SOE-ownership because "the majority shareholder is constantly in possession of the ability to exercise actual control." *An Giang II*, 284 F.Supp.3d at 1357. However, there is no basis to extend this myopic analysis to respondents who are not majority SOE-owned, for which all factors should remain relevant under the traditionally holistic inquiry.

The Government defends Commerce's separate rate denial because "appointment of management equates to **potential control** over the company's operations (**which necessarily includes export operations**)." Gov. Br. at 10 (quoting Remand at 18-19, Appx134-135) (emphases added). This argument should be rejected. First, potential control is an appropriate basis to deny separate rates for majority SOE-owned respondents, and has only been affirmed by this Court in such circumstances. Guizhou Br. at 29-33.[3] Commerce thereby impermissibly surmises that GIIG controlled Guizhou's export activities: "It is

---

[3]    The Government heralds the lone CIT ruling that potential control was found sufficient to deny a separate rate for minority SOE-owned respondent viewing each *de facto* factor in isolation. Gov. Br. at 14, 28 (citing *I.D.I. Int'l Dev. & Inv. Corp. v. United States*, 2021 WL 3082807, *7 (CIT July 6, 2021)). Guizhou submits that *I.D.I.*—beyond being "not binding on this Court," *id*. at 25, is inconsistent with multiple CIT decisions requiring distinct analyses for majority- and minority SOE-owned respondents, as well as Commerce's traditional holistic separate rate methodology. *See* Guizhou Br. at 24-33.

well established that speculation does not constitute 'substantial evidence.'"
*Lucent Tech., Inc. v. United States*, 580 F.3d 1301, 1328 (Fed. Cir. 2009).
Moreover, general operations should not be conflated with specific export
activities that have been the longstanding focus of Commerce's analysis, which
Commerce purportedly employed for GTCIE. U.S. Department of Commerce
Policy No. 05.1 (Apr. 5, 2005), Appx204; Separate Rate Memo at 2, Appx1434.

In short, Commerce improperly transposed the standard for majority
ownership to deny GTCIE's separate rate. Guizhou asks this Court to accept the
CIT-recognized critical distinction between majority and minority SOE-owned
respondents. The truncated analysis through which Commerce denies separate
rates based on potential control over operations by considering each factor in
isolation—thereby creating an irrebuttable presumption of state control—should be
confined to the majority SOE-ownership context. The ordinary rebuttable
presumption, with its applicable *Aukerman* standard, as well as the nexus to actual
control over export activities through holistic consideration, should remain
applicable to minority-owned SOE respondents such as GTCIE. Guizhou,
accordingly, is not asking this Court to "reweigh the factual record" as the
Government insists, Gov. Br. at 34, but instead is requesting that this Court compel
Commerce to employ the correct evidentiary and analytical separate rate
framework in the first instance.

## V.     COMMERCE ARBITRARILY REVERSED ITSELF

Commerce granted GTC's separate rate in the fifth administrative review ("AR5") of the ADD order on new pneumatic off-the-road tires ("OTR") from China in April 2015, just months after the TBT LTFV POI. *OTR from China*, 80 Fed. Reg. 20,197, 20,198-99 (Apr. 15, 2015) (final results). That OTR AR5 proceeding is being appealed by Double Coin Holdings Ltd., a majority SOE-owned respondent denied a separate rate, as a companion to this TBT appeal. *China Mfgrs. Alliance, LLC v. United States*, 639 F.Supp.3d 1260, 1264 (CIT 2023), *appealed as* Fed. Cir. Case No. 23-2391. Between OTR AR5, when GTC was granted a separate rate, and the instant TBT LTFV investigation when its separate rate application was denied, GTC's SOE ownership decreased from 33.84% to 25.2% and Guiyang's SASAC ceased conducting GTC performance reviews. SSRA Exhibit 2, Appx1271; Guizhou Response to Petitioner Rebuttal (Aug. 8, 2016), Attachment 1, Appx1386; *AR5 Final Results*, 80 Fed. Reg. at 20,198-99. In this TBT investigation, Guizhou also provided additional substantial evidence of its independence that was not submitted in OTR AR5—including the Guiyang SASAC Clarification and 2015 Annual Report. Section II, *supra*.

The Government endeavors to defend this nearly contemporaneous Commerce 180-degree about-face as "reflect{ing} the reasonable evolution of Commerce's analysis based on court decisions." Gov. Br. at 36 (citing Remand at

53, Appx169). This argument should be rejected. First, extensive judicial precedent

confirms the propriety of demarcating separate rate analyses depending on whether

the respondent is majority or minority SOE-owned—as properly happened in OTR

AR5, evidenced by the different outcomes for GTC and Double Coin.[4] Second,

simply stating that a practice has evolved based on inapposite precedent does not

constitute the requisite "adequate explanation for the change." *SKF USA, Inc. v.

United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). Finally, Commerce cannot

reasonably find that a respondent demonstrating less SOE ownership and oversight

than when it was granted a separate rate in the past suddenly becomes ineligible for

such status—in the absence of intervening judicial precedent or a formal change in

agency practice effectuated after notice and opportunity for comment.

The Government misplaces reliance on CIT precedent establishing that a

respondent must demonstrate that it "continues to meet the criteria for obtaining a

separate rate." Gov. Br. at 35 (quoting *New Mexico Garlic Growers Coal. v.

United States*, 352 F.Supp.3d 1281, 1289 (CIT 2018)). Commerce cannot

reasonably move the goal posts such that a respondent is granted a separate rate in

one proceeding, and shortly thereafter denied in another proceeding despite

---

[4]     The Government counters that GTC was denied a separate rate in the
seventh administrative review of the ADD order on OTR from China, Gov. Br. at
35-36. Guizhou is challenging the CIT affirmance of that denial as a companion
case to the instant TBT appeal. *Guizhou v. United States*, 641 F.Supp.3d 1371 (CIT
2023), *appealed as* Fed. Cir. Case No. 23-2163.

providing substantial evidence of significantly less SOE ownership and control.

This contemporaneous reversal constitutes arbitrary agency action resulting from

"a clear error in judgment." *Hyundai Elecs. Indus. Co. v. United States*, 899 F.2d

1204, 1209 (Fed. Cir. 1990).

Judicial precedent involving majority SOE-owned respondents does not

support Commerce jettisoning its multi-factor analysis into actual control over

export activities for respondents who are minority SOE-owned. Accordingly,

because "the Department provides no reasonable explanation for changing a

practice that it has consistently followed, **such a change in an unacceptable**

**agency practice**." *WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340,

1344 (CIT 2012). (emphasis added). Indeed, Commerce was required to provide "a

**more detailed justification**" for denying GTCIE's separate rate, because "its **new**

**policy rests upon factual findings that contradict those which underlay its**

**prior policy**." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)

(emphases added). Commerce inexplicably and unreasonably summarily denied

GTCIE's separate rate through findings that contradicted the longstanding

approach followed since *Silicon Carbide* three decades ago—which had been

properly applied to Guizhou in OTR AR5 mere months after the POI of the

decision being challenged in this litigation.

Commerce implemented a radically different separate rate analysis in this

TBT LTFV investigation than it had historically. Until its recent change of practice, Commerce applied *Silicon Carbide* by granting separate rates to respondents having significant—even 100 percent—SOE ownership:

- *Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001), IDM Comment 1 (granting separate rates despite government ownership);

- *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,269 (Sept. 14, 2006), IDM Comment 3 ("information submitted by the Petitioner **addresses only potential control by SASAC** . . . , **rather than any actual control** of the PRC government over the numerous individual export decisions . . . during the POR.") (emphasis added);

- *Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Mar. 31, 2009), IDM Comment II (separate rate granted to subsidiary of company directly owned by SASAC);

- *Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335, 20,338-40 (Apr. 19, 2010) (well-known SOE granted separate rate);

- *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012), IDM Comment 6 ("**the Department has previously found an absence of *de jure* government control for companies with various forms of state ownership**") (emphasis added); and

- *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016), IDM Comment 1 ("examin{ing} whether the holding of a minority stake of a producing entity which is a subsidiary of the exporter, by a local SASAC entity, amounts to *de facto* government control . . . . {B}ased on the totality of the circumstances, we find that there is an absence of government control.").

Commerce arguably acted reasonably by changing practice to automatically deny separate rates for majority SOE-owned respondents through an irrebuttable presumption, given that the government actually controls a corporate entity in

which it has majority ownership. Guizhou Br. at 26-29. That truncated analysis, however, should not be extended to minority SOE-owned respondents such as GTCIE, since minority ownership does not constitute control. *Id*. at 29-33. Where minority SOE-ownership exists, the normal rebuttable presumption, *Aukerman* standard, nexus to actual control over export activities, and holistic consideration of all factors should remain intact. *Id*. at 24-26. 29-33. Otherwise, there will be no limits on Commerce's authority to deny separate rates; indeed, Commerce is poised to find an exporter part of the China-wide entity despite it having no SOE ownership whatsoever. *See Pea Protein from China*, 89 Fed. Reg. 10,038 (Feb. 13, 2024) (preliminary determination), Decision Memorandum at 9-10.

This Court should thus clarify that its recent holdings in *ZMC*, *DSMC*, and *OTR AR5* are limited to records in which there exists majority SOE-ownership. This Court should further clarify that Commerce does not have *carte blanche* to deny separate rates by applying a test contrary to longstanding agency practice.

## CONCLUSION

Based on the foregoing and as set forth in Guizhou's Opening Brief, Guizhou respectfully requests that the CIT's judgment be reversed and remanded for further consideration consistent with this Court's opinion.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak*

- 25 -

Jordan C. Kahn
Dharmendra N. Choudhary

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW Suite 650
Washington, DC 20005
 (202) 783-6881

*599 Lexington Ave., 36th Floor
New York, NY 10022
(212) 557-4000

*Counsel to Plaintiffs-Appellants Guizhou
Tyre Co., Ltd. and Guizhou Tyre Import and
Export Co., Ltd.*

Dated: April 18, 2024

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains less than 14,000 words. This brief contains 5,865 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


Dated: April 18, 2024                              */s/ Ned H. Marshak*
                                                    Ned H. Marshak